IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER HANSON,            :
    Plaintiff,            :
                :
v.            :            CIVIL ACTION NO. 21-CV-3368
                :
LEHIGH COUNTY DISTRICT            :
ATTORNEY'S OFFICE, *et al.*,            :
    Defendants.            :

## MEMORANDUM

ROBRENO, J.                                    SEPTEMBER  1, 2021

Plaintiff Christopher Hanson, a prisoner currently incarcerated at SCI-Mahanoy serving a life sentence, filed this civil action pursuant to 42 U.S.C. § 1983.  Named as Defendants are the Lehigh County District Attorney's Office and District Attorney James B. Martin.  The crux of Hanson's claims is that his constitutional rights have been violated by the Commonwealth's failure to permit DNA testing on biological evidence within the Defendants' control.  For the following reasons, the Court will dismiss Hanson's Complaint pursuant to 28 U.S.C. § 1915A(b)(1).

## I.     FACTUAL ALLEGATIONS[1]

In 1984, Hanson was convicted by a jury of second-degree murder, rape, and conspiracy to commit murder.  *Commonwealth v. Hanson*, No. 2136 EDA 2018, 2019 WL 1770595, at *1 (Pa. Super. Ct. Apr. 22, 2019).  The public record provides the following background to Hanson's convictions, which puts his current claims in context:

---

[1] The following facts are taken from the allegations of the Complaint, attached exhibits, and the public record.

On September 1, 1983, Hanson and Timothy Seip attended the Allentown Fair where the two encountered sixteen-year-old Flora Reinbold. Hanson and Seip decided to purchase some beer, after which, Reinbold accompanied them back to Seip's apartment. Reinbold was subsequently raped and strangled to death through the use of her pantyhose.  Hanson and Seip then threw Reinbold's body into the Lehigh River.

The next day, Hanson went to the police and made a statement outlining his version of the events leading to Reinbold's death.  Specifically, Hanson alleged that Seip was the perpetrator of the rape and murder of Reinbold, and that Hanson had taken no part until after Reinbold was dead.  Hanson subsequently led the police to Reinbold's body.  In contrast, Seip, when providing his statement to the police, alleged that Hanson had been the perpetrator.

Hanson and Seip were charged with criminal homicide, rape, and criminal conspiracy.  Following trial, Hanson was convicted of murder in the second degree [footnotes omitted], rape, and criminal conspiracy.  Shortly before trial, Seip entered into a negotiated guilty plea to the charge of murder in the third degree in return for testifying on behalf of the Commonwealth at Hanson's trial. Both Seip and Hanson testified at Hanson's trial, and while the testimony of these co-conspirators conflicted as to who was the actual perpetrator of the murder, as both pointed the finger at the other, there were numerous matters to which there was no disagreement.  As concluded by the distinguished trial judge, the Honorable William E. Ford, in the PCRA proceedings, the testimony at trial was clearly sufficient to convict Hanson of these crimes as the direct perpetrator, or, in accordance with the Commonwealth's alternative theory, as an accomplice.  The record indicates that the trial court properly charged the jury on the alternative theories as to each of the offenses.

Both testified that they had consumed alcohol prior to and after meeting Reinbold at the Allentown Fair [footnote omitted].  Their trial testimony was similar in many other important regards:

> they both agreed that Reinbold went with them voluntarily to Mr. Seip's apartment in Catasauqua, Pennsylvania.;

> both admitted that the young victim was raped in the apartment;

> both testified that, after the victim had been strangled with her own pantyhose, they disposed of her body in the Lehigh River;

> they agreed that she was dead or near death when she was thrown into the river;

> both admitted that they participated in hiding evidence of the crimes; and

both admitted that they were together, in the presence of the young victim, from the time she was picked up at the Allentown Fair until her body was thrown into the Lehigh River.

The co-defendants differed as to who was the actual perpetrator of the rape and the murder.  Hanson contended that he was present in the apartment when Seip raped the victim, but conceded that he did nothing to stop it.  He also alleged that Seip raped the victim a second time, at the Lehigh River, just before her body was thrown into the river.  Hanson blamed Seip for the strangulation death of the victim.

To the contrary, Seip testified that he was present in the apartment when Hanson raped the victim, but that he was in a different room.  According to his testimony, he did nothing to intervene.  He blamed the strangulation death on Hanson.

The testimony of Lester Lewis, Seip's employment supervisor, was uncontroverted.  He saw both co-conspirators the day after the murder.  Lewis testified that Seip had approached him and told him that he might have been involved in a homicide.  Mr. Lewis told the two of them to turn themselves into the police.  It was at that time that Hanson turned to Seip, and in the presence of Mr. Lewis, told Seip to "Keep your mouth shut and don't say anything more to anybody."  Notes of Testimony, 6/8/83, at 23.

Significant uncontroverted testimony was also given by Carl Yost.  Yost had been Seip's neighbor at all relevant times, and had lived in the same Catasauqua apartment building.  Mr. Yost was in his apartment on the night of the murder when he heard a female scream emanating from Seip's apartment.  He went to the door of Seip's apartment to investigate, and heard "some shuffling noise" and then "muffling sounds."  N.T., 6/8/83, at 227.  Mr. Yost continued with the following testimony:

> And then when I heard this voice I believed it to be Timothy Seip's voice say it like this, I wasn't sure what it was, but it is something like either, I will hold her mouth and you pull down her pants or something similar to that.

*Id.*  Mr. Yost knocked on the door and yelled "Hey ... What's going on?" Again he heard "shuffling noises" and "that muffling noise."  *Id.*

According to Mr. Yost, Seip left the apartment and went to Mr. Yost's door.  As Mr. Yost was talking with Seip, Mr. Yost "heard still like that muffling sound, like somebody, you know, like the girl has-was having her mouth being held shut or something."  N.T., 6/8/83, at 229.

Mr. Yost described his grisly observations later that night coming from the Seip apartment:

> [I]t seemed like they were carrying somebody; you know, carrying this girl because I heard the voice, I know it's a girl, and it sounded like something was holding the mouth shut and going down because I heard that muffling noise yet like she is [s]till trying to talk, but couldn't talk.

N.T., 6/8/83, at 232.

*Hanson v. McGrady*, 11 Civ. 1293, 2012 WL 1205162, at *1-3 (E.D. Pa. Mar. 16, 2012), *report and recommendation adopted*, 2012 WL 1222640 (E.D. Pa. Apr. 11, 2012) (quoting *Commonwealth v. Hanson,* No. 3277 EDA 2004, slip op. at 1-5 (Pa. Super. Ct. Dec. 5, 2005)).

Hanson's judgment of sentence was affirmed in state court and his numerous attempts to obtain post-conviction relief were unsuccessful.  *See Commonwealth v. Hanson*, No. 1005 EDA 2020, 2021 WL 387184, at *1 (Pa. Super. Ct. Feb. 3, 2021) ("Appellant unsuccessfully litigated approximately fourteen collateral relief petitions between 1988 and 2019, several of which included requests for DNA testing.").  Many of his post-conviction petitions specifically sought DNA testing.  *See id.*  Hanson also unsuccessfully sought *habeas* relief in this court.  *See Hanson v. McGrady*, No. 11 Civ. 11293, 2014 WL 2011620, at *1 (E.D. Pa. May 16, 2014).  Most recently, the Pennsylvania Superior Court affirmed the denial of a post-conviction motion Hanson filed seeking DNA testing, concluding that Hanson's request for DNA testing was untimely, that he failed to present a *prima facie* case of innocence warranting DNA testing under Pennsylvania's statute, 42 Pa. Cons. Stat. § 9543.1, and that the Commonwealth did, in fact, instruct the jury that Hanson could be found guilty as the primary perpetrator or as an accomplice despite Hanson's argument to the contrary.  *See Hanson*, 2021 WL 387184, at *4-*7.

Hanson's Complaint in the instant matter seeks access to biological evidence from the crime scene for DNA testing.  It appears Hanson believes that testing on the evidence will establish that Seip, rather than Hanson, was the perpetrator.  *See* Compl. at 8 ("Plaintiff claims he

should have DNA testing done in this case for justice to be served and not suffer a life sentence for crimes committed by Timothy Seip who arranged a third degree plea bargain and who is free only serving 15 years of a ten to 20 year sentence.").)

Hanson asserts that he "has been asking for DNA testing for the access of evidence in the Commonwealth[']s possession with the record providing these facts from PCRA filings and Hearings from 2001 and 2004, with recent 2021 Superior Affirm." *Id.* at 5. He generally alleges that "his civil rights were violated by the Commonwealth's post-conviction procedures, not by the initial depravation [sic] of the DNA evidence." *Id.* at 3. Hanson adds that District Attorney Martin and his Office have custody of the evidence and "may cause irreparable harm" by denying him access to that evidence for testing. *Id.* at 4. The Complaint does not clearly indicate what specific material Hanson seeks to test, explain why testing on that material could undermine Hanson's convictions, or discuss the relevant state procedures in any way.

Indeed, some of Hanson's allegations do not appear to pertain to DNA testing at all. He describes a post-conviction hearing that took place in 1989 that appears to have addressed his request for testing of certain biological evidence for the presence of a drug called Septra D.S., which Hanson had been prescribed in connection with a prostate condition. *Id.* at 4-5. Hanson indicates that his request to test certain evidence for this drug was denied even though a doctor testified that "Septra D.S. could be detected if looked for in the evidence the Commonwealth had, from the victim in this case and if missing may support [his] version of events." *Id.*

Additionally, Hanson attached to his Complaint a copy of an opinion from the Pennsylvania Superior Court addressing an appeal he filed from a denial of one of his numerous post-conviction petitions. Compl. Ex. A. In that opinion, the Supreme Court vacated the trial court's denial of a post-conviction petition Hanson filed in 2010 on the basis that it was time-

5

barred.  The Superior Court concluded that Hanson's petition was not time-barred because he alleged previously unknown facts to challenge his conviction in connection with an affidavit from an individual by the name of Colie B. Chappelle "in which Chappelle sets forth personal knowledge of an agreement between the prosecutor in [Hanson's] case and [his] co-conspirator." *Id.* at 2.  It is unclear what relevance this opinion has to Hanson's request for DNA (or any other) testing of biological material in this case.

Based on these allegations, the Court understands Hanson to be bringing due process and Eighth Amendment claims based on the Defendants refusal to remit evidence for DNA testing.[2] Compl. at 9.  Hanson seeks a declaration that his rights have been violated and an injunction "commanding the defendants to produce for analysis any biological evidence relating to the crimes [in the underlying criminal case], including, but not limited necessarily to, evidence collected during the investigation of the crimes . . . , as well as any biological evidence taken from co-defendant Timothy Seip or offered by Plaintiff for comparison purposes." *Id.* at 10. Hanson also seeks the approval of a proposed plan "detailing the chain of custody that was followed, and to be followed," and an order shortening his sentence "to time served" in the event the Commonwealth produces evidence that he "was not [the] culprit." *Id.* at 10, 11.  Hanson also

---

[2] Hanson alleges that his prostate condition has worsened, in part due to inadequate medical care during his incarceration, and that the pandemic has worsened the conditions of his confinement.  Compl. at 5-7.  To the extent Hanson sought to bring claims based on these allegations, they are not plausible because the named Defendants are not responsible for the provision of medical care to Hanson during his incarceration or the conditions of his confinement.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (explaining that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable for civil rights violations).  Any challenges to Hanson's conditions of his confinement at SCI-Retreat and SCI-Mahanoy, which are located in the Middle District of Pennsylvania, *see* 28 U.S.C. § 118(b), must be pursued against the appropriate defendants in the appropriate district.

filed a Motion for Appointment of Counsel and a "Motion to Supplement," which essentially seeks expedited relief due to the conditions in which Hanson is confined and again requests counsel.

## II.   STANDARD OF REVIEW

Although Hanson has paid the filing fee and administrative fee in full, the Court is required to screen his Complaint pursuant to 28 U.S.C. § 1915A.  *See Shane v. Fauver*, 213 F.3d 113, 116 n.2 (3d Cir. 2000) (recognizing that the district courts have the authority to screen a prisoner complaint pursuant to § 1915A(b)(1) even if the prisoner is not proceeding *in forma pauperis*).  Section 1915A requires that the Court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a).  In doing so, the Court must dismiss a complaint or any portion thereof that "is frivolous, malicious, or fails to state a claim upon which relief may be granted," *id.* § 1915A(b)(1), or that "seeks monetary relief from a defendant who is immune from such relief," *id.* § 1915A(b)(2).

Whether a complaint fails to state a claim under § 1915A(b)(1) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Neal v. Pa. Bd. of Prob. & Parole*, No. 96 Civ. 7923, 1997 WL 338838, at *1 (E.D. Pa. June 19, 1997); *see also Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).  Accordingly, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  As Hanson is proceeding *pro se*, the Court construes his allegations liberally.  *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011).

### III.    DISCUSSION

The vehicle by which federal constitutional claims may be brought in federal court is

Section 1983 of Title 42 of the United States Code, which provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S.

42, 48 (1988).  Hanson's claims fail because he has not alleged a constitutional violation, as

discussed below.

#### A.    Request for Resentencing

Hanson's request for early release by means of a shorter sentence is not cognizable in a §

1983 action.  That is because "when a state prisoner is challenging the very fact or duration of

his physical imprisonment, and the relief he seeks is a determination that he is entitled to

immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ

of habeas corpus."  *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973).  Accordingly, any

requests for release or a shorter sentence based on new evidence of innocence or otherwise must

be made through a petition for a writ of *habeas corpus* filed pursuant to 28 U.S.C. § 2254.[3]

#### B.    Due Process Claims

---

[3] Petitioners seeking to file a second or successive petition must first seek permission
from the United States Court of Appeals for the Third Circuit before filing the petition with the
district court.  *See* 28 U.S.C. § 2244.

Hanson's primary claim is that Pennsylvania's post-conviction procedures violated his due process rights by preventing him from testing biological materials to establish either his innocence or his diminished culpability for the crimes of conviction.[4]  The United States Supreme Court's decision in *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009) controls this claim.

In *Osborne*, the Supreme Court held that the federal constitution does not provide a broad, freestanding right to access DNA evidence in the post-conviction setting, thus concluding that there is no such substantive due process right.  *Id.* at 72.  Specifically, the Court found that there was no long history of such a right of access to state evidence to perform DNA testing and the mere novelty of such a claim was reason enough to doubt that substantive due process sustains it.  *Id.* (quoting *Reno v. Flores,* 507 U.S. 292, 303 (1993)); *accord Skinner v. Switzer,* 562 U.S. 521, 525 (2011) ("*Osborne* rejected the extension of substantive due process to this area and left slim room for the prisoner [seeking access to DNA testing] to show that the governing state law denies him procedural due process.") (internal citations omitted); *Grier v. Klem*, 591 F.3d 672, 678 (3d Cir. 2010) (relying upon *Osborne* and acknowledging that plaintiff had no substantive due process right to access DNA evidence). Accordingly, to the extent Hanson intended to claim a violation of substantive due process, his claim is not plausible and must be dismissed.

Turning to Hanson's procedural due process claim, the *Osborne* Court recognized that a prisoner retains a liberty interest in demonstrating his innocence with new evidence under state law.  *Osborne*, 557 U.S. at 68.  As stated in *Osborne*,

---

[4] It is unclear whether Hanson is claiming to be fully innocent of the crimes for which he was convicted or whether he is instead alleging that he was less culpable than Seip or only innocent of certain claims.

> A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man.  At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt.  But once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears.  Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.
>
> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief.  When a State chooses to offer help to those seeking relief from convictions, due process does not dictate the exact form such assistance must assume.  Osborne's right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief.  *Brady* is the wrong framework.
>
> Instead, the question is whether consideration of Osborne's claim within the framework of the State's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation.  Federal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided.

*Id*. at 68-69 (internal quotations and citations omitted).  The Court saw "nothing inadequate" about postconviction procedures that limited release upon a showing of new evidence establishing innocence to circumstances in which the evidence was diligently pursued and sufficiently material.  *Id* at 70.  The *Osborne* Court also made clear that it is the plaintiff's burden to demonstrate the inadequacy of the state-law procedures available to him in the context of state post-conviction relief.  *Id.* at 71.

The United States Court of Appeals for the Third Circuit, in discussing *Osborne*, has observed that "procedural due process does not *require* that a district attorney disclose all potentially exculpatory evidence for postconviction relief to a prisoner."  *Grier*, 591 F.3d at 678.  Consistent with *Osborne*, "only when those procedures are determined fundamentally unfair or constitutionally inadequate will a federal action under § 1983 lie."  *Id.* at 679.  The question is

whether the prisoner's "procedural due process rights, when considered within the framework of

Pennsylvania's procedures for postconviction relief, were violated." *Id.* at 679.

Pennsylvania's DNA testing procedures are governed by statute. *See* 42 Pa. Cons. Stat. §

9543.1.  The statute sets forth several threshold requirements to obtain DNA testing:  (1) the

evidence specified must be available for testing on the date of the motion; (2) if the evidence was

discovered prior to the applicant's conviction, it was not already tested because (a) technology

for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not

request testing in a case that went to verdict before January 1, 1995 or the evidence was tested

but newer technology could provide more accurate and substantially probative results; or (c)

counsel sought funds from the court to pay for the testing because his client was indigent, and the

court refused the request despite the client's indigency.  42 Pa. Cons. Stat. § 9543.1(a)(2).

Additionally, under section 9543.1(c)(3), the petitioner is required to present a *prima facie* case

that the requested DNA testing, assuming it gives exculpatory results, would establish the

petitioner's actual innocence of the crime.  Under § 9543.1(d)(2), a court is directed not to order

the testing if it determines, after review of the trial record, that there is no reasonable possibility

that the testing would produce exculpatory evidence to establish petitioner's actual innocence.

Hanson has not stated a plausible claim for violation of his procedural due process rights.

He baldly claims that "his civil rights were violated by the Commonwealth's post-conviction

procedures," but it is not clear what aspect of these procedures he believes violated his rights,

especially since it is not clear from the Complaint in this case which materials he seeks to test,

whether those materials exist, what he seeks to test them for, and why that testing is material to

establishing his innocence or diminished responsibility.  More importantly, in the context of this

case, in which the public record establishes Hanson's guilt under a theory that he was either the

primary perpetrator or an accomplice, it is not clear what value DNA evidence holds at all.  In

other words, even if testing supported Hanson's version of events, *i.e.*, that Seip was the primary

perpetrator, the state courts have already held that his convictions remain valid under a theory of

accomplice liability.  *See Hanson*, 2021 WL 387184, at *6 ("Even if further DNA testing

revealed additional evidence of Mr. Seip's DNA, that would not necessarily prove Appellant's

innocence.  Furthermore, a lack of Appellant's DNA would not prove his innocence either, given

the other evidence presented at trial showing that Appellant acted as Mr. Seip's accomplice.").

Under these circumstances, as Hanson has received the process he was due to seek testing of the

material, it is difficult to understand how Pennsylvania's procedures for post-conviction DNA

testing could be found "fundamentally inaccurate" to vindicate Hanson's rights.

Indeed, Hanson has failed to allege any facts from which the Court could conclude that

Pennsylvania's procedures for post-conviction DNA testing, which are similar to those the

Supreme Court found adequate in *Osborne*, are fundamentally unfair or inadequate.  Notably,

other courts have found Pennsylvania's procedure to be adequate in the context of § 1983 cases

filed by prisoners seeking post-conviction DNA testing.  *See Young v. Philadelphia Cty. Dist.

Attorney's Office,* 341 F. App'x 843, 845 (3d Cir. 2009) ("In order for Pennsylvania's procedures

to violate due process, they must offend, at a minimum, some principle of justice so rooted in the

traditions and conscience of our people to be ranked as fundamental, or they must transgress a

recognized principle of fundamental fairness in operation. We conclude that Pennsylvania's

procedures for post-conviction relief do neither." (internal quotations and citation omitted));

*Wagner v. Dist. Att'y Allegheny Cty., Pa.*, No. 11 Civ. 762, 2012 WL 2090093, at *10 (W.D. Pa.

May 21, 2012) ("Wagner fails to make the difficult showing that the Pennsylvania DNA testing

procedures as discussed above are facially invalid as they contain similar requirements and

12

limitations imposed by other DNA-testing statutes, including the post-conviction statute upheld in *Osborne*."), *report and recommendation adopted*, 2012 WL 2089799 (W.D. Pa. June 8, 2012). In sum, Hanson has not alleged a plausible basis for a procedural due process claim.  *See Spuck v. Pennsylvania*, 456 F. App'x 72, 73 (3d Cir. 2012) (*per curiam*) (summarily affirming dismissal where plaintiff made "no attempt . . . to explain how Pennsylvania's specific procedures for postconviction DNA testing are inadequate as a matter of federal law" (footnote omitted)); *Miller v. Biden*, No. 11 Civ. 707, 2014 WL 3385678, at *2 (D. Del. July 9, 2014) (dismissing pleading that "fail[ed] to contain allegations explaining how Delaware's postconviction procedures for disclosure of alleged exculpatory are inadequate as a matter of law").

### C.   Eighth Amendment Claims

Hanson also characterizes the denial of biological evidence for DNA testing as an Eighth Amendment violation.  Courts presented with similar claims have held, consistent with *Osborne*, that the refusal to provide a prisoner with postconviction DNA testing does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.  *Accord Alvarez v. Att'y Gen. for Fla.,* 679 F.3d 1257, 1265 (11th Cir. 2012) ("We can discern no conceivable basis in this case, nor has Alvarez provided us with one, for attempting an end-run around the *Osborne* holding under the cloak of the . . . Eighth Amendment[]."); *see also McKithen v. Brown*, 626 F.3d 143, 155 (2d Cir. 2010) (explaining that "'[t]he only way the Eighth Amendment is possibly implicated,' as a legal means for compelling the disclosure of evidence for post-conviction DNA testing, 'is if it permits a freestanding claim of actual innocence. . . .'  [But] "[t]he Supreme Court has left conspicuously unanswered the question whether the Eighth Amendment provides such a freestanding claim," although it has noted the "'difficult questions such a right would pose

and the high standard any claimant would have to meet.'") (quoting *Osborne*); *Young*, 341 F. App'x at 845 n.1 ("The absence of a federal constitutional right to post-conviction DNA evidence forecloses Young's Eighth Amendment claim, which rested upon his due process argument."); *Williams v. McCulloch*, No. 15 Civ. 70, 2015 WL 222170, at *3 (E.D. Mo. Jan. 14, 2015) ("The state's refusal to conduct DNA testing is not punishment.  Therefore, there is no Eighth Amendment violation."); *Nelson v. Preleski*, Civ. 20 Civ. 778, 2020 WL 4937991, at *9 (D. Conn. Aug. 24, 2020) ("[C]onsonant with *Osborne*'s reasoning in declining to recognize a substantive due process right, this court finds that Nelson has no right under the Eighth Amendment to release of evidence for postconviction DNA testing.").  Accordingly, Hanson's Eighth Amendment claims are not plausible and will be dismissed with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court will dismiss Hanson's Complaint for failure to state a claim, pursuant to 28 U.S.C. § 1915A(b)(1) as to all Defendants.  Hanson will not be given leave to amend because the Court concludes that the defects in Hanson's claims are not curable, such that amendment would be futile.  Hanson's Motion for Counsel and Motion to Supplement will be denied.  *See Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993) (in determining whether appointment of counsel is appropriate, the Court should first determine whether plaintiff's lawsuit has a legal basis).  An appropriate Order follows.

BY THE COURT:


/s/ Eduardo C. Robreno
**EDUARDO C. ROBRENO, J.**